Good morning your honor. May it please the court, I am Dave Domina. I'm here on behalf of raisin producers who for six years produced a crop of raisins, sold the crop, got paid for part of it, had part of it taken, and want to be paid for the balance. That's the case. Under California law, raisins are private property. Their raisins were taken when they were delivered to market each year in a fraction that was determined by the United States. The taken raisins were used for public purposes. Those public purposes included funding the school lunch program and for a variety of other purposes. Some of the raisins- They did not have an equity interest in them? Your honor, it's true- They were supposedly taken? Yes, your honor. The raisin marketing order provides that there is to be a fund generated by what happens to those reserve raisins and that it is to be returned back to the producers. But that would only be partial compensation for what is taken here. Because unlike all of the other marketing orders, these raisins have their title actually transferred from the producer to the United States. They become the property of the government. The government decides how to use them, when to give back. Why isn't this a regulatory taking? It could be. We win either way. Whether it's a physical or a regulatory taking, we think it's most simply seen as a physical one. I thought you lost on all- I thought every case that has come up where these marketing orders have been seen as regulatory taking lose. Well, I think that's true. Now, we have to confine ourselves to raisins here, your honor. Which is why I thought you brought this as a physical taking case, because every regulatory taking case loses. Well, it is why. But we still think we win under a regulatory taking. And here's why, and I really don't want to focus on the weaker side of the case, but I want to answer your question. And let me say that last week, this court issued an opinion again in a case you seem to have trouble getting rid of in Sienaga, in which you said on pages 29 or 30 that partial compensation, coming from something that you get back from the government, is only a part of the compensation formula and that doesn't eliminate the need to complete the compensation process. And we think that's a part of the answer to the question here. So I've covered the issues really about why there's a physical taking. Our property is simply stripped away from us. Title passes to the government. That happens when it goes in bins. But now let's talk about the regulatory side of what occurs, because from a lawyer's point of view, it's more fascinating. But your property wasn't seized from you. You gave it to them. That's not correct, Your Honor. That isn't correct. You face a regulatory scheme that's been in place for half a century. That's true. It isn't the only way you can actually market these. You can't do it otherwise. And so it's a hard choice. You either don't have to sell raisins or you join the scheme and give them the raisins. They haven't seized anything. Well, what happens here is that we produce the raisins, we own them. We have only one way to market them, and that's to deliver them to a handler or be a handler ourselves. And when that happens, at that moment, some fraction, up to 47 percent of the title to the raisins automatically passes to the government. Sometimes it's 47, sometimes it's less. In one of the six years, it was actually zero. It ranged from zero to 47 during the six years at issue. The Secretary of Agriculture At that time, are you saying there was a physical taking of the zero? Not in that year. Not in that year. But that's simply one of the years in this array. In every other year, there was a taking of whatever fraction the Secretary of Agriculture chose. Now, in that year, there was no physical taking because the government decided not to take. Just as though the government was building an interstate highway and decided to jog it one mile to the west and not go through Johnson's Farm. Johnson would never take it. I really didn't understand that you had preserved a regulatory taking claim. I really understood your claim was to be a purely, you know, an actual taking. I thought that was weighed like an oral argument in 16 other ways. Well, we didn't weigh it. We were asked, which is this? Our complaint specifically says, I think in the first paragraph, that the government takes through a regulatory scheme. Now, I think we win either way. But, I mean, if the trial court says, which claim are you making? And you say, physical taking. Fine. You don't have any regulatory taking claim. Well, I don't think that... I mean, you have to be, play straight with the trial court. Well, I didn't think we were doing otherwise. I didn't think the trial court was asking me to make an election of remedies. I thought he was asking me to make an election of arguments. But you're displaying regulatory taking a lot of the time. In the course of the oral argument, the inquiry was, if there's no physical taking, I'm sorry, is there a physical taking or are you depending entirely on a regulatory taking? And our response was, there is a physical taking that occurs here, Your Honor. And that is our position. There is a physical taking that occurs here. It happens as a result of a regulatory scheme. We also argue that if, as a matter of fact, the government were to prevail on the point that somehow this is, to use the government's analogy, a toll that we have to pay in order to get rid of these raisins that we produce so the nation can have them, then the taking that occurs so defeats our investment-based expectations and so invades our ability to be engaged in this business and is so clearly imbued with government purpose that that taking is regulatory. Hypothetically, could they produce or sell all of the raisins intrastate? Theoretically, that's a possibility. That would not, however, avoid our status as a handler because the definition of handler under the regulation is so broad, pardon me, that it covers, that's one of the things that it covers is taking the raisins outside of what is defined within the regulation as the state of California only. Could you sell raisins within the state of California directly? We could not, however, sort them, stem them, clean them, or wash them. We'd have to sell them raw because sorting them, stemming them, cleaning them, and washing them makes us a packer, and a packer, by definition, is a handler, and a handler is required to give off the percentage of the crop that the Secretary of Agriculture commands we give off annually. But on the other hand, you're accepting the structure of the deal by being allowed to sell a portion directly. Well, there is no government-conferred benefit for that, Your Honor. That simply allows us to sell a portion of the crop in the free market. The free market is not given by the state. The free market, then, is really being improved by the fact that there is only a portion of those raisins that are being sold in the free market, while the others are being obtained off the free market. In 1949, when the order was passed, that was precisely the theory of the order, that by an orderly progression of movement of raisins to the market, the market would be stabilized and improved. Exactly. Now, we allege in our complaint, and therefore at this stage of the proceedings it's taken as true, that in fact what is now happening, and has been happening since 2000, is that a fraction of the crop taken from us each year in which there is a taking is given back to packers in what is called the Raisin Back Program. The packers get those from the government free or at a reduced price, and then in turn can use them for cereal raisins, for raisins sold to stores and delis, for raisins in commerce. So what's happening is that both in the foreign trade aspect and in the domestic trade aspect of the use of the taken raisins, the domestic price is being depressed, and the precise reason for the order in 1949 is subverted. And that allegation is made overtly in our complaint. So we believe there is in fact a physical taking. We do not believe, and we respect the argument of the government that we, you know, we don't have to do this, we could sell these raisins at a roadside stand, unstemmed, uncleaned, unsorted, but in that condition they are not what any of us know as raisins. They are simply products that are virtually useless for livestock feed and entirely useless for the human population. I take it that the reason these raisins go in this, what do you call it? The Raisin Back Program? Raisin Back Program, is that the board, which represents the industry in part, has made a decision to put that aside for the reserve. Too many raisins. They like made a mistake. And that's why the raisins go back. So the way the scheme works is your representatives on the board made a bad guess. Well, the Secretary of Agriculture decides the amount. The board makes a recommendation. That's answer number one. So our claim is against the Secretary and the federal government. Number two, I think that a fair response to your question would involve a very dramatic dip into the politics and the economic and political structure of the raisin industry. And there is no question that is a substantial issue here as well. Thank you very much. I'll reserve my time for rebuttal if I may, Your Honor. All right. Good morning. Good morning. May it please the Court. My first point is that at least with respect to the crop year 2004-2005 in which there was zero percent reserve, we have a concession now that there was no physical taking there. And at least the Court should affirm with respect to that year. But more broadly with respect to the regulatory takings claim, we put in our supplemental appendix the only one page, and in the very first line of that page, the producers below said this is a physical, not regulatory takings case. So any attempt now to convert this into a regulatory takings case is improper. And the Court should not entertain any regulatory takings claim by the producers here because that is a very different claim. That is a claim that's covered by the Penn Central factors, which is a very different claim than one in which a property owner says that the government has reached out and seized or appropriated or somehow other physically taken property. Well, the government takes – well, first, that is what they allege, and at least for true. And there is authority for that. The 989.66a talks about those raisins being set aside to the account of the RAC. And this court in Lyon Raisins, at least in that footnote 9. So, yes. But that title transfers to the extent that – title to any property transfers during a consensual transaction between property owner and a purchaser. It's consensual. And that's his choice. And he consensually hands over those raisins to the handler. He doesn't have to hand over those raisins to the handler. What's the alternative? The alternative is, as counsel conceded, that he could sell his raisins raw. He could – and this happens. Brokers, for example, go around to vineyards and offer to buy raisins in place. Then they put them in trucks and bring them to the handler. Or, I hypothesized below, and the producers never refuted this, that I could stop those trucks on the road and offer to buy the raisins in those trucks, and then I would bring them to the handler. And my transaction of those raisins to the handler would be subject to the regulations of which they complain. And the producers – Is there such a market? Yes. Apparently there is a market for uncleaned, unstemmed, unsorted raisins in – so far as brokers go to raisin producers and buy those raisins in place. As long as the raisin – But who's going to get the low price? Because some – who's ever buying it is going to sell it to somebody who has to set some aside. So the price is going to be the same. Well, the price will be whatever the market could bear for uncleaned, unstemmed, unsorted raisins. But as – But the same price he's getting from the handlers. Well – He's not a handler in any particular place, so he's going to get the same price because it's all driven by the fact that some of the crop is going into the reserve fund. Presumably. At least we don't know anything from the complaint that suggests anything else. But even if it were a lower price, the takings clause of the Fifth Amendment does not subsidize a business person's hard choice. I really have a hard time seeing any of this as voluntary. I realize the Supreme Court calls a lot of things voluntary that aren't. I think your better argument is on the more technical side. And that's what was reflected in footnote 9. That once the raisins were transferred to RAC, buying no longer had a property interest. And that it's a physical taking. And I think that's what the lower court went on, didn't they? Yes. And in effect – What's the status of this footnote 9? Is that just dicta? No. Footnote 9 deals with what those producers were claiming in Lion Raisins. Which was, they took our raisins by converting or by mishandling that equity interest. And this court said, if you're complaining about the equity interest, you can't say it's a taking of the raisins because by the time you get an equity interest, they're no longer your raisins. So it wasn't dicta. That was the second basis upon which the producer's takings claim was dismissed. The first was that they were alleging an improper application of the equity reserve interest. Which, because they alleged it was unlawful, could not be the basis of a takings claim in the first place. But yes, if the court wants to look at it that way, then the reason we prevail is because the government, the RAC, and the person of the RAC, only gets a hold of the raisins once the handler sets those aside. And the handler only gets them once the producer gives them to the handler. So there's a step – the government is one step removed from the producer's transaction with the handler by just that, the transaction with the handler. The government never – and this is the reason we focus so much on their insistence that this was a physical taking – the government never exercised its authority to go and get those raisins ever. Those raisins would never come within the purview of this regulation had not they, as they allege in their complaint, dried them, picked them, put them in their trucks, and drove them to the handling plant. This is – and although it's an odd – I admit, I agree that it's an odd claim to characterize as a physical takings claim, that is their claim. They insist upon it in the same way as the property owner in Norman – this court's Norman opinion – insisted that it was a physical takings case. And this court said that because they couldn't point to anything that required them to transfer that land to that nonprofit association, the transfer itself could not become the basis of a physical takings claim. This is analogous because they point to what happens as a result of a transaction that the government never pushed them into. They made the business choice to drive those raisins to the handler to get presumably whatever additional benefits, whatever better price is available through marketing raisins or having handlers market those raisins as opposed to having me buy those raisins in their trucks or me go to their farm and buy those raisins in place. But that is their business choice and the takings claim doesn't subsidize hard business choices. What happens if their claim really was in fact a claim based upon the equity participation in the pool, saying the fact that the pool was very poorly managed and instead of receiving $5, they were receiving $2? Is that a takings claim at that point? Absolutely not. That would put them up against the same problem the producers in Lyon Raisins had, which was a claim that the equity pool is not being lawfully managed, not being properly managed, which takes it out of the takings realm because no allegation of unlawful or improper government conduct can be the subject of a takings claim. Their interest in the pool itself is due to their lack of ownership in the raisins. The raisins that they own at one time, when it goes to the rack, the rack then puts it into the pool, the pool is disbanded. Is that really a conversion of their property from the rack? If it is a conversion, then that would, no, well if it is a conversion, then they would have to admit that that is a lawful conversion and then they would have to argue somehow that the government, that for example, instead of, on page 39 of the appendix is their complaint and they allege that in the 1999-2000 crop year, they had a 15% reserve, there was a 15% reserve. Well, their allegation presumably would be that we were entitled to a 15%, we had a 15% interest in the sales of those raisins and they only gave us 14%. I think their allegation would be that in that particular year, 15% were reserved and 15% were sold for $1,000 instead of $5,000. So it was a lost year of $4,000 of their property. Yes, but that would not be a proper takings claim because they would have to argue somehow that it should have been sold for $500 and yet it was sold for $400 and that was wrong and therefore, we're owed money, but that wouldn't be a takings claim because the allegation would be they should have sold it for $500, but that's not the same as saying they did sell it for $500, they kept $100 and they sent $400 back to us. That would be a takings claim, that would be a claim that the government took their equity interest, took one-fifth of their equity interest, that the government took that $100, still has it and we're owed that $100, but they don't make anything like that claim. And even if they did, they can't say, they would have to say we took their equity interest or we took a portion of their equity interest. They don't say that, they say we took their raisins, we took their physical raisins, their tangible raisins and that never happened because, as Your Honor pointed out, they gave those raisins to us to the extent that... Would they be restricted in bringing that claim because BRAC was considered a NAFI? No, and this court held in Lyon Raisins that a NAFI claim, I'm sorry, a takings claim can be predicated in part on an allegation that the taking was affected by the RAC because... It's not a contract. Right, that just because something is a NAFI doesn't preclude the takings claim. So they could make that claim, but they haven't as yet. If they make that claim, we'll see what the government says against it. Is BRAC really a takings claim or a contract claim? I don't know of any contract between producers and the RAC that would be the basis of a defense like that. Is this the only product in which there is this physical segregation of the agricultural product? No. There are other ones where the handler is required to physically separate the goods? Yes, the almond case comes to mind, cow almonds, as I recall. Hopefully I recall this accurately, but those are also segregated. The difference in this case is that there's no assertion with respect to almonds that those segregated almonds become the property of the RAC. They're not set aside, at least the regulations don't talk about this, to the account of the RAC. They're set aside, but the handler still retains ownership or something? Yes, either the handler or the producer himself. Don't they have an administrative review procedure for those that is absent here? I don't know whether producers in the almond context have their own administrative remedy. I know that raisin producers, as producers, don't have an administrative remedy. At least, and here I'm not addressing the exception that Judge Leto noted that might exist, but the statute gives a handler the right to go to the secretary and complain about whatever he wants to complain about. But as we pointed out, these regulations don't even apply. And as the court in Lyon Raisin said, these regulations don't even apply to producers. So although producers, as producers, don't have a remedy before the secretary, nor do the regulations require anything of producers. So it makes sense that they don't have a remedy, since they don't even come within their purview. Whose interests are the handlers representing? The handlers are not representing the interests of the RAC so much as abiding by a regulation to do something with reserve pool raisins. Are they with the producer responsibility to the producers or to the RAC? It might be to both. As I read the regulations, they have a responsibility to put those raisins to the account of the government, but also to do accounting that allows for the return of the equity interest, the equity interest in the sale of any future, I'm sorry, the proceeds of any future sale of those raisins to the producers. So I say that they have a fiduciary obligation to both. But to the extent that the court is willing to entertain any regulatory-type taking, the court should follow the path that the court of claims blazed in Carruth regarding that peanut order. In that case like this, the producers said that they were essentially forced into the thing that they said constituted the taking. In that case, it was the sale within 24 hours. There was an alternative there. The peanut producers could have cleaned those peanuts instead of selling them. They made the business choice to sell the same way that these producers made the business choice to deliver. And so like in Carruth, this is not any kind of a taking. And the court of claims pointed out that in that case, there was no direct appropriation or confiscation. But it's a limited take. It's a limited choice. Well, yes, but that's what the Commerce Clause allows Congress to do. No one has a takings clause right to participate in a regulated market. No one has a takings clause right to participate in an unregulated market. And that's what these producers want. They want the benefits of a regulated market without having to pay the toll to enter that market. A toll which they freely paid. Thank you. May it please the court. What's clear is that my clients don't have the raisins. They don't have their money. What may not be quite so clear is that they do not participate in a regulated market. The free tonnage raisins are sold in a cash, unregulated market. The reserve raisins are not sold. This is not a case involving a choice to be in a regulated market at all. That's not an accurate statement. Furthermore, there's some confusion here about whether or not there are transfers to handlers going on. The definition of handler is so broad that it includes any processor packer, any person who places ships or continues nature condition raisins in the current commerce from within an area to the point outside, any person who delivers off-grade or failing raisins or any person who blends them. If we're going to sell the product that we set about in the beginning of the year to produce and before that when we planted our vines, some of which predate the statute, we wanted to produce raisins. We didn't want to produce animal feed. We didn't want to produce an unclean product. We wanted to produce raisins. The government has taken from us the opportunity to market a part of what we set about to produce. That is, in fact, a physical taking. It comes about as a result of a scheme that was designed in the beginning to even the market. At that point, there was some market regulation. There's not one allegation in the complaint that there is any market evening going on, nor is there any argument by the government to that effect. Instead, these raisins are used for federal purposes. As the federal government sees, they're acquired for nothing or nearly nothing. They're used to support foreign trade and to give back to the packers who are politically savvy and the producers are shorted. The Fifth Amendment's the remedy. Thank you. I prefer this branch of the government, Your Honor. Thank you very much. Thank you.